DAMPSKIBSELSKABET NORDEN v. IS-BRANDTSEN–MOLLER CO., Inc.

ISBRANDTSEN–MOLLER CO., Inc., v. DAMPSKIBSELSKABET NORDEN.

District Court, S. D. New York.

June 20, 1930.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Charles R. Hickox

and Clement C. Rinehart, both of New York City, of counsel), for libelant and cross-respondent.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (Roscoe H. Hupper, of New York City, of counsel), for respondent and cross-libelant.

KNOX, District Judge.

The owner of the Katonia seeks to recover the sum of $2,565.46 from the Isbrandtsen-Moller Company, Inc., charterer of the vessel, as a balance due under an agreement of January 4, 1927, for the portion of the charter time extending from 7 o'clock a. m. on July 27, 1927, to 4:10 o'clock on August 15, 1927, after the allowance of certain credits which the owner concedes the charterer is entitled to receive.

Shortly after the owner's libel was filed, the charterer began a cross-suit charging a breach of the charter party, in that the hull of the vessel was allowed to become so foul as to lessen her speed, and to increase her coal consumption, with the result that more than twelve days' time was lost.

The charterer's contention is that not only is it not indebted to the owner of the ship, but is, itself, entitled to receive the sum of $1,767.89.

The relevant provisions of the charter party are as follows:

"Steamer to be placed at the disposal of the charterers * * * being on her delivery * * * tight, staunch, strong and in every way fitted for the service * * *

"1. That the owners shall * * * keep the steamers in a thoroughly efficient state in hull, machinery and equipment for and during the service. * * *

"15. That in the event of the loss of time from deficiency of men or stores, fire, breakdown or damages to hull, machinery or equipment, grounding, detention by average accidents to ship or cargo, dry docking for the purpose of examination or painting bottom, or by any other cause preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra coal consumed in conveyance thereof, and all extra expense shall be deducted from the hire."

A typewritten notation along the margin of the charter party was in these words:

"Steamer was docked and painted December, 1926."

This inscription appears alongside clause No. 21 of the charter, which, however, has been eliminated by ink lines drawn through the printed matter.

Clause 21 reads:

"That as the Steamer may be from time to time employed in tropical waters during the term of this charter, steamer is to be docked, bottom cleaned and painted whenever Charterer and Master think necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be suspended until she is again in proper state for the service."

Charterer hired the Katonia for a minimum period of five months, with the option, which was exercised, of an additional one and three-quarters months. Voyages of the vessel through tropical waters were within the contemplation of the parties.

When the charterers took possession of the ship at 7 o'clock on the morning of January 12, 1927, she was admittedly "tight, staunch, strong and in every way fitted for the service."

The first voyage under the agreement was from Norfolk to Antilla, and the boat averaged eight and nine-tenths knots per hour. On a trip which was then made from Antilla to New York, the speed averaged eight and one-tenth knots. From New York, the Katonia visited ports along the Gulf and the eastern coast of Mexico and Central America, thence proceeding through the canal to various west coast ports within the tropics.

During the time consumed in those voyages, the ship's speed ranged from nine and one-half knots to something under four, taking into account the passage through the canal, and all conditions of weather, draft, and coal supply.

On May 11, 1927, the Katonia sailed from La Paz, Mexico. Going up the west coast, she put into San Francisco for coal on the 24th of May. In making this trip, she was without cargo, and encountered bad weather which persisted for eleven days. On one day a speed of one and one-quarter knots per hour was averaged. From San Francisco, the vessel proceeded to Seattle, arriving on the 30th of May. She left Seattle on June 4th, going down through the canal to Tampico, which was reached on the 9th of July. On this voyage, the speed averaged six and nine-tenths knots.

Leaving Tampico, the Katonia went to Cuba in ballast, meeting heavy winds and seas on the way, at an average speed of 5.7 knots. She took on sugar at Tarafa and came to New York, covering the distance at the average rate of about eight knots per hour. On two days of the voyage, she made as high as nine knots, and on four days touched eight and one-half.

The master of the Katonia testified that with fair weather, smooth seas, and burning about fourteen tons of good Pocahontas coal, the Katonia, and if not loaded too deeply, could not reasonably be expected to make more than eight and one-half knots per hour.

Under date of July 8, 1927, the master wrote a letter to charterers in which he said:

"Enclosed please find harbor report for the Panama Canal and I regret very much that the speed on this voyage was rather slow due to the fact that the bottom got very much overgrown during the long stay in Central American ports. We cleaned the boot topping and as far down under the waterlines as we were able to reach before loading was started at Seattle. By the way, I expected to get the ship in dry drock at Seattle as I had also informed my owner that the bottom was much overgrown, but as I did not receive any order to dry dock, I could, of course, not take the responsibility to arrange same as the six months since our last dry docking had not expired. The coal we received at Seattle gave good steam but was very ineconomical, about 24% ashes, the reason why we took a rather big quantity of coal at Panama Canal.

"It is now the rainy season at Tampico with constantly outgoing current (fresh water), and I hope part of the growth and barnacle will fall off the bottom before sailing, as we otherwise hardly will have sufficient bunkers on board."

With the present charter party before me, and having regard for its deletions and additions, I am fairly well convinced that the parties to the agreement did not intend that the Katonia should be dry-docked, and her hull cleaned of marine growths, during the charter period. When the agreement was signed, the charterer did not know if the services of the vessel would be required beyond July 27, 1927, which would be but little beyond the period within which the vessel would in ordinary course be drydocked and painted. A specific statement that the vessel had been docked and painted in December, 1926, became a part of the charter party, in substitution for printed clause No. 21, upon which the charterer might have in-

sisted had it not been willing to waive its provisions. The elision of that clause, and the insertion of the notation along the margin of the charter party, specifically called attention to the possibility that the vessel's hull might become foul if she were to trade in tropical waters. The charterer knew the use to which the vessel was to be put, and the waters through she would travel, and if it wished to protect itself against the consequences of marine growths encumbering the hull, specific provision for that contingency should have been made. It will not do to take chances with marine growths, and then at a later date seek to hold the owner to liability under a provision of general fitness contained in the agreement, which was designed to cover an entirely different subject matter.

These facts here are strikingly similar to those before the court in Glasgow Shipowners Co., Ltd., v. Bacon (C. C. A.) 139 F. 541, and upon the authority of that decision, the libel of the charterer's will be dismissed, and that of the owners sustained.